case being argued. This is case number 22 26 22 United States of America. First, Anthony D. Parker will lead. I understand Mr Suffren. It will will lead. Uh, you have. Thank you for appearing remotely under the circumstances. This is really something. Um, yeah, really is. Um, and I guess I guess the first question is, uh, I don't know how you're gonna divide, um, rebuttal time. But how much would you like to reserve for rebuttal? Respectfully. Thank you, Your Honor. I'd ask for three minutes, although I'm not sure that I will use it. Okay, very good. You say to our ears the night so that I would use it part always glad to hear that. All right. The floor is yours. Thank you. May it please the court. Your honors. My name is David Suffren. I represent Anthony Parker in this appeal. And interestingly, um, I first I'd like to just I'm starting my timer now. No, I'll thank the court for allowing you to appear virtually. Obviously, this week was certainly interesting. Covid went through this office very quickly and savagely. And today is really my first day back. And so if my voice falters or if I have to sneeze, you'll understand why I were in the same. I'm in the same firm as the trial owner who tried this case in the district court. Mr Zucker was, um, was back here every day. And we talked about the case literally every day. Um, and I intend to rely principally during the course of these arguments on the brief that we submitted, um, uh, in, uh, on behalf of Mr Parker and three separate points that are that are in that brief. But I will make my arguments as brief as I can. The three points in our brief are no less important chronologically, actually, in order of how they arose during the course of the trial. And, um, perhaps each issue, if it were to be examined alone by itself, may not rise to the level of, um, exceeding harmless error, but cumulatively under the circumstances in this case, and it's an unusual one, uh, because the themes that ran through the jury and ran through the course of the trial from the 404 B motion that started off, um, to the summation and opening statements by the prosecutor in this case, um, had their effect on at least one, if not more of the jurors that required a full voir dire of the entire jury during the course of their deliberations. And so when you look at all three of the errors that we point out in our brief, I think it was a cumulative effect, not just one, uh, rather than, uh, each individual one. And, you know, it may be arguable that any of the individual points that we raised wouldn't rise past the level of harmless error, but cumulatively, we argue, um, that they do. I'm, I'm, I'm a little surprised that you would say that I would have assumed you would really focus on the 404 B argument, which would make it unnecessary to look at the other two. I'm surprised. I intend to, I intend to your honor. The 404 B issue is, you know, is the one put forward because it was the one that occurred first. And it was the evidence that Mr. Parker was a former or known or reputed drug dealer in Camden city. And the fact is that there were far easier ways of eliciting the purpose, the profit purpose of the government's need to use that evidence was indicated in their brief and argued before the trial court, um, which by the way, didn't issue its decision on the 404 B issue until after the cat had already been let out of the barn. I'm confused by that. There's a statement that he made an oral ruling and then apparently he filed an opinion confirming or announcing the ruling the morning of the trial. That's right, but he didn't issue the oral ruling on the record until after the prosecutor opened, opened her opening remarks on that particularized assertion that Mr. Parker was the subject of a longstanding drug investigation. And again, the proffer with respect to that, and that was before the trial court made its determination on the 404 B issue and the proffer, the government's proffer with respect to why that was important was because they said that they were concerned about cross-examination and explaining why the lead investigator detective Henry didn't immediately arrest Mr. Parker because he was in a liquor store holding a handgun close to his leg. And again, the reason for the proffer of 404 B was simply to explain why he wasn't immediately arrested. And again, Mr. Parker wasn't Mr. Parker wasn't charged with drug possession, drug dealing, drug distribution. He wasn't charged with anything related to drug activity. He was charged with firearms and witness tampering. Those were the only charges that were before the jury. So although I acknowledge that all evidence is prejudicial in a criminal case, which is something we learned early on, it has to certainly be relevant to a material element in the case when element in the state's proofs. In this case, eliciting testimony that he was a known drug dealer, not just in her opening, but throughout the course of her direct examination of the government's witnesses gave rise to this inference in the jury room that we know for a fact affected the jury substantially. And so the problem is that there were far less intrusive ways that the prosecutor could have fashioned her opening, fashioned the evidential proffer. They could have said that Mr. Parker was known to police. They could have said that Mr. Parker was in the in the motion in Lemonade. The reason given for the delay between the time of the citing of Mr. Parker with a gun and stopping him for a traffic violation an hour later was because there's a perfectly logical reason because Henry was working undercover. He was an unmarked car. They didn't want to blow his cover. And that's why Henry didn't. It's perfectly logical. That was the reason that the government gave initially. But that's not that wasn't what the testimony turned out to be. No, and the judge, the trial court, actually the trial court actually admonished the prosecutor on her third or second police witness to stick to the facts and to be careful and prep her witnesses better with respect to how she was eliciting this testimony. There's actually a narrative or a colloquy between the judge and the prosecutor where he cautions her. You better do better job prepping your witnesses because this because you're limited with respect to what I ordered. And this is going outside of the limits of what I ordered for that proffer. That said, I still believe in Mr. Zucker believed at the time that the evidence that he was a known drug dealer. And again, this is evidence that wasn't just. Well, I think it's important to note that it was part of the government's opening playing front and center in the government's case. And unlike maybe some cases, we actually have a mind into the view of what and precisely how it affected jury. Because during the course of the trial, one of the jurors or more of the jurors, as they walked in for the second day of trial, announced to the court that they saw a black SUV with tinted windows playing loud music that had to do with sex and drugs that they were concerned. They characterized it as an urban setting. One of the jurors who was questioned about it actually said specifically when I have it here, I have the actual language that the juror gave us when he was questioned. It was juror. 14, he said he saw something odd, strange, weird. He asked another juror if she sensed it was weird when they saw this black SUV. And the juror explained to the judge who was I assume the concern was for their safety. I'm going to be flat out honest with you. I have no idea why they took the guy to relocate the tow truck driver. I know that there are drugs involved. I don't know how popular this guy is. Something in the milk ain't white. I'm concerned. I have no idea if that man on trial is any deeper in his involvement in things. I'm curious as to your take on how significant Henry's inaction was in the trial. The opening, as I recall, the opening of Mr. Zucker talked about whether Henry had the opportunity to observe the situation. But I'm just wondering your take on this issue, his inaction. Is this a central issue in, I mean, I can guess your answer. But give me your take on how significant this issue was. I don't think it's significant. I think it's an issue that could have been, like we talked about earlier, easily explained to the jury. And they made the arrest. So at the end of the day, his inaction at this scene is essentially remedied in a few hours. I mean, they issued Ebola, which is an all points bulletin for be on the lookout for Mr. Parker. They took relatively immediate action based on what the detective says he observed. And they found the car within, I think, two hours of it, of his initial observation. I think under the circumstances, I don't think his inaction is significant enough to have even in the subject of cross examination. But my original point was, if I open on it by opening on this fact, we had no choice. That is, Mr. Zucker had no choice but to cross examine on the delay. It may not have been an issue. It may not have been significant enough to even make it a point for the jury. When you have an eyewitness account by a police officer who offers credible testimony. That said, there were a number of other mitigating features in this case, including the lack of DNA evidence that at least one of the jurors in the jury room, this is the one who was struck, seemed to call out as a major issue, at least in her deliberations. So on the 404B issue, what curative rule or not do you think limiting instruction, the limiting instruction had in this case? Because we get a fair amount of 404B missteps. And then we go through this kind of four part test. You have to clear 403. You have to do all these other things. And then maybe the last thought is, well, hey, was there a curative limiting instruction that kind of put the jury on the right path? And why, you know, are we basically saying, you know, undermining the presumption that juries follow limiting instructions? What's your take on that? My take is that I didn't actually see a sufficient curative instruction from the trial court that would have remedied the situation. I did not see that. And the proof is in the pudding, Judge. Your Honor, the proof is essentially that, number one, you have this issue midway during the trial with respect to the black SUV. So drugs are still in the mind of the jury. And then we know at the end of the trial, based on the comments of the jurors that were barred here, that drugs were front and center. They're talking about urban settings. They're talking about growing up in the hood and Camden hood stuff and all that. There was, I mean, narcotics. The dog alerted to narcotics. So there's no objection to the admissibility of that, is there? I don't know that there was. I don't actually know that there was a dog. There was a dog. I'm not sure I came in. There was a dog. I don't remember hearing if that was before the jury. I thought the dog alerted for narcotics and that that was as they were seizing, once they seized the car, or as the reason to seize the car, the dog alerted to narcotics. Yeah, I think that's how they got the search warrant, Judge, after the fact. So, yeah. Exactly. So drugs were in the case, which leads to a harmless error question of drugs were in this case. Does it matter the amount of drugs that were in the case or whatever? How can we be sure that the additional ones had something to do with us compared to the dog? So I think the issue is that the car, where the drugs were found, was in the possession of this, how shall I call it? Shop. Charismatic fellow named David Brisbane. I'm sure you read his testimony. I know how charismatic he was. He was charismatic. It was colorful. And to say that, you know, so with respect to the drugs, he and why he were in the car, they took the car, they had the car that night. And the testimony was that at that time, the car was discovered in their possession, that they were the ones who had last had the car. So I would argue that since Mr. Parker had not been charged with the drugs, and since those two fellows were in the car last, that's my timer, that, you know, the fact is that no drugs were ever found in the car, Your Honor. There were no drugs found in the car. There was no CDS of any kind recovered from the car with the exception of the firearm and the cell phones and the cash that was in the glove compartment. No drugs were ever located. And I think that's the important part of that, that takes that out of the case. And again, the issue is the proffer. The issue is why the government believed that it was necessary to present that proof. And my answer to that is it wasn't and could have been in a far less significant matter. And you've actually seen the case law that we cite that came up. I don't have it right in front of me, but it's cited in our first point with respect to the 404B. Smith is when again, primarily. Yeah, it came up during the course of the voir dire with the judge and the jury, although in a different context, it was front and center in both the prosecutor's opening and in her closing where she characterized again, Mr. Parker is a known drug dealer. And I think that's important with respect to the consideration of how precisely this information was processed by the jury. And again, we know it because we have an insight because of this extensive voir dire, both after the summations during deliberation and during the course of this incident with the black SUV that conjured up images in at least one or more jurors of drug dealers in urban settings, stalking them, watching them enter the courthouse as the result of how deep Mr. Parker was in whatever involvement or whatever criminal activity he was in. So I think that demonstrates the precise prejudicial effect that no juror could get around for these jurors who don't. I mean, it appears that at least two of these jurors have vivid imaginations. It turned out to be a very innocuous thing, but they were already watching the screenplay in their heads of what was really going on in the trial. And it wasn't real. It was based, at least in part, on what they thought was going on behind the scenes here. Evidence that was not properly before the jury. Let me just tease out maybe, you know, let me just make an argument for you to just explain maybe why you disagree with it. Could you make a case if you were on the other side that Detective Henry's credibility was kind of really important here, you know, in terms of, you know, who's the government witness that's going to testify to possession with the gun? I think it's only Henry that's going to do that. And so you can sit there and say, well, hey, anything unusual about our key witnesses testimony we'd like to get out in front of. And one of the ways that we'd like to get in front of it is to begin to give a very full explanation for exactly why an arrest wasn't made on the spot. You know, I get that. I get that that's controversial, but does this begin to rise to the level of something more than a harmless error when you cast it in that light? So the question I would have in response to that question, Your Honor, is why do that in your opening? Why not wait for defense counsel to cross-examine on that particular subject, on that exact issue? Why open on it, which then forces defense counsel's hand to address it after the fact rather than a far more innocuous way to explain it that we've already heard could have been from Detective Henry. And I know that Mr. Zucker was vigorous with respect to his cross-examination of Detective Henry. And, you know, Detective Henry, the jury also, I think, saw the video from the liquor store. The video saw, I think, 16 different cameras, none of which had Mr. Parker holding a gun or anywhere near a firearm or anything that could have been construed as a firearm during the course of those videos. So the answer to that question is we'll never know because the prosecutor decided before she got a ruling from a judge who was overseeing this exact issue, she opened on it. And once she did that, there was no other strategy for defense counsel to take but to address that issue. So that's it. Could you address, move on, if you don't mind, to the dismissal of the juror? Under our case law, you know, if a juror is not deliberating, the judge has wide discretion. And unlike his 404B ruling, which I think is pretty sparse, Judge Hillman really gave a pretty extensive overview of why he dismissed that juror, a lot of which had to do his view of the credibility of the juror and her saying, oh, no, I was, you know, I was fine. He found her not credible. How do we say the judge abused his discretion in dismissing her? So Judge Hillman issued that credibility determination after the fact. He did it in, I think, a written opinion that he issued after he made his oral determination to strike her. I don't believe that those credibility findings or a detailed basis for those findings was made on the record during the course of the trial. I think that was in his written opinion. I may be mistaken, but that is my recollection. Does that matter if a judge gives a shorthand view during trial and then elaborates? You know, I want to say sort of, because after the fact, it's easy to come up with a million. Thank you. I'm sorry. I'm going to take a quick sip of water. It might be easier for a judge to come up with a litany of reasons, but if you actually read the underlying testimony from not just juror numbers 1 and 12, it was juror 12 that was struck. Juror 1 and juror 12 were the only two jurors of color that were on the jury. And when you consider what the testimony was from the other voir dire jurors, all of them, nobody actually said that there was much of a problem, except that jurors wanted to speak to their guns. And evidentially, the issue was that there was this missing piece of the puzzle with respect to DNA evidence. I don't see anywhere from the voir dire. I don't want to argue with you. But going through piece to piece, I surmise that at least seven or eight of them said she was, you could conclude she was not deliberating as she should, not willing to. And I think there was a confusion with, I'm sorry, Judge. My answer to that is I disagree with the conclusion that Judge Hillman made. And I believe that it was incorrect based on the totality of the voir dire. And again, to strike a juror, I think the standard of proof is beyond proof, beyond a reasonable doubt. In this case, speaking of standard of review, I mean, standard of proof, it kind of leads me to standard of review. And we might be, you know, it might be an abuse of discretion. But if the error is not preserved, then we're into plain error, where abuse of discretion is prong one, the standard of error. But then we get into, you know, the other three, the plainness of the error. And then we get into these kind of broader, you know, impact on the case and then kind of impact on the judiciary prongs. And so you have to run that gamut. And if it's a close case at all, it strikes me that your ability to show plain error just begins to fall apart at those last three prongs. What do you say? Yeah, I mean, I have no choice but to agree with that analysis, except to note that we disagree with the underlying conclusion with respect to the credibility determination that Judge Hillman made under the circumstances. Let me ask you another question related to that. You know, this notion of cumulative error or aggregating error is, you know, it's kind of an interesting thing in the sense of it's, you know, if the errors all relate to the same topic or the same issue, you can see the compounding more naturally. One of the areas that we haven't really touched too much on in the case law that I can tell at all is what happens when the errors are subject to different standards of appellate review. One's plain error, one's abuse of discretion. It gets really hard to begin to add errors up when they aren't, you know, if they're all clear error review, right, on a finding of fact, just the aggregation process adding is easier. But if one's clear error, one's abuse of discretion, and one's four-pronged plain error, man, cumulative error becomes, for lack of a better word, complex. I was going to say cumulative. Yeah, oh, there you go. And I mean, I agree with that analysis as well. I, you know, I think you could pick the least of the evils in this case. And even that, you know, there are three points. Even, you know, I probably should not have started off by saying any one of these individual errors doesn't maybe go beyond harmless error. But, you know, at the end of the day, yeah, sure, it's a cumulative argument. And there are different standards of review. And, you know, fortunately, it's not just the order of the chronology. I think the third point of our brief is probably the weakest with respect to the error that's alleged. But I certainly think that you could at least pick one and two, the 404B and the comments, the gratuitous comments in point two that were made by the prosecutor to suggest that, you know, look, jurors look at prosecutors automatically. We know the trait of a prosecutor. They carry more credibility to a jury. And the fact that this jury characterized these witnesses as liars tends to suggest maybe she knew something that in evidence or something evidence-based that the jury didn't get to consider, of course, that she knew that these people were liars, these witnesses. You've got some very, very strong arguments on Ms. Harberge and I'll call it pathetic closing argument. But the fact that she referred to testimony as lies, I mean, that happens all the time. I'm not sure that's the best argument. I mean, it shouldn't happen, though. That's the point. And it wasn't just in that instance. It's combined with telling the jury that it's one thing to characterize a witness as a liar. That's one thing. But it's another thing to comment on a conspiracy or suggest some sort of a conspiracy between defense counsel and the witnesses in the case to color their testimony. I mean, that's the equivalent of, I mean, the government's burden to prove the case beyond a reasonable doubt. Commenting on the defense's right to present a defense of any kind should not be permitted and I think improperly invaded into Mr. Parker's due process rights. The government counsel did apologize. You don't really see lawyers apologize and the judge gave a pretty strong curative instruction kind of putting her back in her place. Well, he didn't, though. He did to a degree. She doubled down on her rebuttal, though. I mean, she basically called the defense smoke and mirrors in her rebuttal and then the judge never addressed the comments about the lies. That phrase, smoke and mirrors, appeared a lot in closing argument. It shouldn't appear from prosecutors, is my view. Under the circumstances, prosecutors, again, they have a higher burden with respect to these types of proofs. Jurors consider what they say as evidence-based and there was no substantiation in the record that would have given rise to her ability to say to a jury, defense counsel and his client conspired to come up with a fishtail. I think that's, I mean, I understand, Your Honors, the view of points one and three as stronger points. To me, I mean, when I read that summation, my mouth dropped open. I was literally shocked. Maybe it's just my 90 to 10, but I was shocked when I read that. Shocked. Okay. Well, I think you reserve time for rebuttal unless my colleagues have questions. We'll hear from you on rebuttal and now we'll hear from Mr. Ramsey. Good afternoon, Your Honors. May it please the court. My name is Richard Ramsey and I represent the United States. Just to, I guess, continue. Is Ms. Harberg still with the office? She is and she is in the courtroom right now. Good, because my inclination when I read this was to ask the U.S. Attorney to have her present in the courtroom. I'll be really candid with you. Every time I've read this, as a former prosecutor, and I'm very proud of what prosecutors stand for and the job that they do, I become more and more. Offended was after the third or fourth reading. After the fifth or sixth reading, I went from offended to incensed. It boggles my mind. It absolutely boggles my mind. The 404B stuff is bad enough, especially when you put in your motion for eliminate, that the reason to get into drug surveillance is because Henry didn't want to blow his cover. Perfectly appropriate. We still submit the way he handled that is if defense counsel doesn't open the door, which he didn't, you don't have to get into the delay at all. And I can understand the argument, well, you don't want to know what the jurors are going to talk about. Jurors might go into the jury room and they might start wondering, wait a minute, there's no gun on the guy. The video didn't pick it up. They waited an hour to pick up, to stop because there's something wrong here. So you want to head that off. So you out the evidence first. And you do that, as you said you were going to in your motion for eliminate, by saying he didn't want to blow his cover. You just ask Henry, why didn't you make an arrest when you saw him with the gun? He says, well, I was undercover. I had an unmarked car. I didn't want to blow the cover. Real simple, really easy. This goes away. That's bad enough. But to open with it in your opening statement, number two, and then in closing argument to call defense counsel to accuse defense counsel of suborning perjury, that's what she did. She said he's sitting there with his client. He's got his typewriter. And they're getting the statements together with the police report. And basically, counsel is cooking up perjury testimony with Mr. Perker, the drug dealer that we all know about. It's flat out misconduct. Now, I don't see anything close to it not being a violation of the rules of professional conduct. The issue, I guess, is what do we do? Is it harmless error? I don't see it as harmless. But I'm only one post. You can still roll the dice and try to get one of my colleagues to convince me that I'm wrong. But I don't know which of the people at Santa Dismas Harbor find her conduct here beyond offensive, totally unprofessional. And I'm embarrassed as a prosecutor to read this transcript. Other than that, would you like to know what I think about the case? I guess I'll start with two responses to what Judge McKee has just said. First, I would like to apologize again on behalf of our office for making those remarks. We do accept responsibility for those remarks. And we don't anticipate that that will happen again. I sure hope not. The second point I wanted to make is that even though we opened on this information, the 404B evidence was triggered by the suppression motion. And in the suppression motion, defense counsel went after Detective Henry. Did the jury ever see the suppression motion? No, but this is the information that Judge Hillman had to consider. And also, we didn't know what defense. Did he really? Because isn't it a matter of whether the issue is presented at trial? If everything raised pre-trial was related to an issue, the case could go on forever. But it really is whether there was an issue at trial. So I think the suppression motion really dictates what is at issue, doesn't it? I don't know of a case that says that. Well, we had to confront that issue. We had no assurance from defense counsel. So if I understand what you're saying... But it wasn't raised. So I think... It hasn't been raised in the trial. Maybe just to nuance what I might have heard you say, and then anything that Judge Rendell has, let's make sure that you respond. But to nuance what you're saying is, well, we had a heads up. We had some intel about what we thought the defense was going to attack our case on. And we gained that from the suppression hearing. Based on that heads up, based on that intel, we made a strategic decision. It might be an unusual one. But we made a strategic decision to lead with this in our intro to maybe just be even better, maybe, at heading off this attack. Is that the nuance that I'm hearing you put on it? That's correct. And to the extent I interrupted you with the video link, I'm so sorry. And please weigh in as appropriate. Well, my question is, I believe that the 404B, we examine whether there is an issue at trial. At trial. And we never know whether there's an issue at trial until the trial has begun. And the parties have the opportunity to pick and choose what they might have thought of pre-trial to then raise the issues. But this was not an issue at trial so far. It wasn't. And that's true, Judge, that it wasn't an issue at that point. But that's the whole purpose. I mean, the government wants to take all precautions in introducing this evidence. So it moved in limine to deal with what defense counsel had already raised in this case. And what was the reason you gave in limine for wanting to admit the evidence? To explain why. There were two reasons. First is to explain why Detective Henry did not stop Mr. Parker immediately when he saw the gun. And how that. And what was that reason? Because he was undercover. Right. And he was. That's it. It ends there. But he was. But the delay. And it could have been. The delay was he was undercover. He had to get somebody out there who wasn't going to blow his cover. That's what I have to worry about. That was my point. You don't have to get into sliming the defendant, which is what this is, with this kind of evidence. All you have to do is say, ask Henry, why didn't you arrest him immediately? Get out the time sequence. Why didn't you arrest him immediately when he saw the gun? I was undercover. I was in plainclothes. My car was not marked. I make an arrest, especially in a so-called high crime neighborhood. I blow my cover. I can't work in that neighborhood ever again because everybody in that neighborhood will know when they see me, I'm a cop. My usefulness to the force is ruined. That's what you have to do. I can agree with that to a certain extent, Judge. There were more officers who had to testify about what they did in combination with what Detective Henry did. So how do you... In plainclothes or uniform? Both. My question would be, how does... Whether Henry knew him from a drug investigation, what does that have to do? How is that probative of, I didn't act because I was undercover? I mean, if that's the reason, I didn't act because I was undercover, what does... Oh, and I knew him for a prior drug event. What does that have to do with anything? Well, it explains why he didn't stop him because he knows that he has a record that he's involved in. That's the reason to stop him. That's not a reason not to stop him. He had no backup at the time. He couldn't just go in and... He couldn't just go in and arrest someone without any assurances that he would be protected. So he could have said, I didn't have any backup. Not only was I undercover, I blew my cover, I had no backup. That's it. But they also wanted to get intelligence on what Mr. Parker was doing in the neighborhood. So that's what takes the hour and a half. Could they have gotten that without saying, this guy's been under investigation by the Drug Task Force, we know him well. He's very familiar to us. Well, I'm not sure. I think this is only a small portion of testimony and I... That's like saying, well, aside from that, Mrs. Lincoln, how'd you enjoy the play? I would, I guess, point the court to three places where Detective Henry talks about this and only one place where Detective Gonzalez talks about this. It's 198 to 99 of the record, page 200, page 230 as regard to Detective Henry. And for Detective Gonzalez, it's page 302. It's only about one, maybe one and a half pages of testimony over a six-day trial. It happened on day one. When the government opens and says, we know him from a drug investigation, the jurors, I think to me, lights and sirens kind of go off. That may be so, but I guess... That's true. They know he's a druggie. He's a drug dealer. He's been under investigation for a while. This is not his first rodeo. And they possess guns. Drug dealers possess guns. That is all true, Judge. And I don't disagree with you on that. But I would also remind the court, I guess, what Judge Rendell had pointed to defense counsel earlier is that a dog alerted to drugs in Mr. Parker's car. And that testimony came out from cross-examination of Mr. Officer Wiesbecki. And that, so that... He was never charged with drug possession. They never found any drugs. That's correct. I mean, the real problem that I'm sensing from the panel is that there was an easy, very compelling, pretty thorough explanation for the delay in arrest. That you yourself said, not you, but that you also said was going to be the reason for the evidence coming in. And so there's really good reasons for this. And those reasons are sufficient, I think, at least in many ways, for not putting in evidence that Mr. Parker has anything to do with drug crimes at that point in time. And so then if we isolate just that one part of the statement about why did you have to extra little step? And if we look at that extra step's probative value, it might be very small if you've already got a good case, right, for why the delay is there. Yes, only 11 to his character. That's what it's called. Well, it probably still has some... Yeah, I mean, it's tough. You know, that's a tiny amount of probative value. And so then when we want to talk about what substantially outweighs when the probative value is really tiny. Now, the point was trying to be proved. I don't think that's tiny. I think explaining away the delay, that's a good point. I don't think that's a small point in the grand scheme. But this piece of evidence, what it adds to that point, can you make a case that it was important? Or do you have to say it really doesn't move the ball too much on proving delay? Well, we have the hour and a half, and a jury listening to this evidence may be wondering why are we targeting this guy for some reason? And we've got to explain... You should answer that question. We've got to explain. I mean, the crimes we could have been investigating him for could have been worse than drugs. It could have been murder or any number of dangerous or violent crimes that one of the detectives, or I think it was Detective Henry, had already talked about why they weren't in the neighborhood. So I don't think... But so just walk me through. The probative value, after you establish that he's undercover, after you establish that might not have the police force necessary to make a safe arrest under these circumstances, what value is added by saying, oh, we believe him to be a known drug dealer? Probative value. The probative value is to explain why it took an hour and a half for them to arrest him. I still don't get that connection, even if it were admissible. I don't get why it took an hour, unless they were waiting for him to do a deal. Well, as we explained to the judge, we wanted to see where he was going, who he was going to meet with, where he was stopping. This was all fronted. We didn't hide the ball. Why is that relevant? Did the judge reason through the 404B analysis and talk about the probative value versus the prejudice? As I recall, the judge allowed it on the basis of clarity. Clarity. To avoid juror confusion. I don't recall that the district court judge actually reasoned through the probative value, whether it outweighs the prejudice, did he? Well, he... People know. The order says yes. He... Read the transcript. Where did he see it? Where did he do it? He did it, let's see, on page 172 to 174 of the record. I'm at appendix... Where exactly? I found he said it's for clarity, and he really didn't. Yeah, and I think, I think Your Honor is referring to his written order. Yeah, provide clarity. And the court will not allow it for in-depth questioning. And then, during the trial, Judge Hillman warned counsels they were going beyond what he had wanted, what he had allowed. Right, now, on that point, I guess a point of clarification is that the... The prosecutors didn't get the written order. They got the oral ruling, I guess, days or weeks before the actual trial. There's a problem with the instance of the order. But they didn't get the order until... They didn't see the order until after that first day of testimony. But they knew about Rule 404B and Rule 403, I assume, before they even indicted. Sure, yes. Yeah. But the prosecutors weren't trying to go beyond Judge Hillman's ruling. They just didn't know that Judge Hillman was only going to allow it through this one detective. They're just trying to get beyond 404B. No, we made our proffer, and Judge Hillman kept saying he's inclined to... What was the proffer? The proffer was that it was going to explain why Detective Henry didn't stop Mr. Parker immediately, and why... What was the explanation as to why he wasn't stopped immediately? Because he was undercover, and he couldn't blow his cover by arresting Mr. Parker on the spot. Exactly, that's it. Not that he was known to the Drug Task Force. If a guy's working undercover, they want to blow the cover. That's the point I'm trying to make. That's all you had to do. That's what you said. Now, you again, Mr. Ramsey, I don't want to beat about you too much. I'll use you as an agent for the office. That's what the motion of the minute stated, as to why it was relevant. It's not relevant for anything but that, except for bad character. It's a very relevant character evidence. I would point the court to Appendix Site 31 to 32, where we told the court that the Task Force officers were aware, based on confidential source reporting, that Mr. Parker ran the drugs at a Newport and Thurman, and that he occupied a leadership role in the distribution of crack cocaine and heroin from the location. In addition, the Task Force officers had previously observed Mr. Parker interacting with the set workers at the drug set on multiple occasions. They'd seen him commit five murders of rival drug dealers. For this trial, for what he's charged with here, how is that relevant? Well, it's not relevant to the jury, certainly, but it is relevant to Judge Hillman's assessment and Rule 403 assessment, as to why the prohibitive value outweighed the unfair. Yeah, yeah. Prohibitive of what? The fact that he's a bad dude, or the fact that he's guilty of defensive charges in this case? Prohibitive of why the officers didn't arrest him immediately. They were back to... And why this took an hour and a half for them to track him down. But do you see the prejudice? Do you think of the prejudice? This is a gun possession case, and they say he is under a drug investigation. Do you see the prejudice of the introduction of that? Yes, but the rule asks the judge, and we as prosecutors, to assess whether it's unfairly prejudicial. And in this case, because of what Detective Henry and the other... It's not just Detective Henry. Don't go where you're sitting. Please don't go there. If you're going to say, because of what they knew... No, no, no, no, no. I'm saying that because of all the things that transpired, all the different aspects of the surveillance that transpired from the moment that Detective Henry saw Mr. Parker with the gun to the point of stopping Mr. Parker. All of that is coming out, and the jurors are left to wonder whether Mr. Parker is the... Why Mr. Parker is the target of this... Of Detective Henry and all these other officers. I think one of the important things that I think you have in your favor is that we're under abuse of discretion review. And so there's a lot of evidentiary rulings that courts of appeals, many months later, would say, oh, that was a bad ruling. It wouldn't have made that ruling. There's a little bit of armchair quarterbacking in this rule, but you're under abuse of discretion. So even rulings that we think, if we were there, we wouldn't make will be affirmed under abuse of discretion, but it is still possible to abuse discretion. And when there is minimal marginal probative value of evidence, it feels that you're teetering. You're getting out on the thinner ice in terms of when discretion can be abused. And so we're just in this situation where the Judge McKee opened, aside from his kind of monologue opening, but his questioning opening with the points of, you had such an easy way of doing this. And that's a good point. So then adding the drug dealer part is marginally probative. And when you get marginally probative, that's a bad combo under abuse of discretion review. What do you say? You think that that's okay under abuse of discretion? Well, my response would be this. Even if you were to find that it was an error on the probative side of things, I think the court still has to consider the limiting instructions. And Judge Hillman told the jury that they were not allowed to consider this evidence to prove the charges against Mr. Parker. And we can assume that, as I think Your Honor, Judge Phipps said at the beginning, we can presume that the jury followed that instruction. So that should eliminate... Yeah. We can presume that. And so, and the mixed verdict, I think, reinforces that because it's not like the jury was on, the jury just didn't parse through the evidence and the arguments. And so maybe just to add another layer to that, when you give a limiting instruction, it sure feels a lot less like you're abusing your discretion. You recognize, District Judge, you recognize that there might be a potential for jurors to construe evidence the wrong way, an impermissible way. And then you say, please don't do that. You can't consider that for purposes of proving guilt. And so... Judge Hillman didn't do that on his own. Defense counsel asked for it. Yeah. And that's Huddleston, Martin IV, something like that. And so it's kind of weird then to get what you ask for, to receive what you ask for from the defense counsel side, and then say, we've still got an error that was an abuse of discretion. Right. And I think the challenge to the limiting instruction, I think we argued in our brief that that's under plain error review because I know counsel disagrees or says it's ineffective now, but back then he didn't say that. So I think the court would have to find that an error was plain, the error in giving the instruction and what the instruction entailed would be plain error. If the trial court does not perform the proper 4R4B balancing test as we have enunciated it, isn't that under de novo review by us? Yes. Rather than an abuse of discretion. It is, but Judge Hillman did conduct a 403 analysis multiple times, not just when he issued his ruling, his written ruling, but he also did a 403 calculation when Detective Gonzalez testified, defense objected. And he said at that point that the evidence was cumulative and unnecessary. So Judge Hillman balanced what he thought would... But in Caldwell, we specifically did a four-part test. It's pretty explicit. And I don't see where Judge Hillman went through that four-part test. Well, it wasn't... I will say that it was not a long 403 analysis, but... I'm sorry, Judge. 404B. As to... It's a 404B test. But the third prong is a 404... The third prong of the 404B analysis is, I think, the 403... That's how I see this nesting together. Is that where you're at? Yes. And I apologize if I didn't hear your question correctly, Judge. And so what you're saying is, if I reprise your answer, what you're saying is we've got this Huddleston-slash-Caldwell test. It requires four discrete pieces of analysis, or at least four discrete elements. The third one is 403 balancing. The 403 balancing might not have been the most robust 403 balancing that we've ever seen, but it was nonetheless done. So the four steps were followed to the extent that there is a grievance with the third prong. That's really an abuse of discretion thing that has to be looked at against the ameliorative effects of the presumption that a jury will follow the limiting instruction. Correct. What about the closing argument, which is highly offensive? That's right. I've seen a situation before that... If I had seen it, I think I would remember it, where a prosecutor accuses defense counsel of suborning perjury and says they're not interested in the truth. Of course they're not interested in the truth. What defense counsel could possibly be interested in the truth and still defend their client? Well, there are exceptions. There are some exceptions to that, but not many, because I think it's pretty evident that most of the folks who are charged with crimes are guilty of the crimes they're charged with. So if the test is defense counsel's got to be interested in getting to the truth, we can forget about the Sixth Amendment. It's not there. You've got a right to a defense. And if the prosecutor can get up and say that defense counsel's not interested in the truth, they're getting the stories together, and Mr. Zucker's over there with the defendant, and they're conjuring up lies, how do you fix that? I mean, she then kind of came with the smoke and mirrors doubling down, as is argued, but then arguably, quote, walked it back. I'm not sure she walked it back to the door she walked into, but I don't know how you fix that. I don't know how in the world you can possibly fix that, because it negates the entire defense, especially since they now know this guy's a major drug dealer. Defense counsel's sitting there next to this damn drug dealer, trying to get him off. I'm not sure where you want me to start. How do you fix that? How do you fix that argument in closing arguments? Start there. Apologizing to the jury, which we did, and Judge Hillman... She didn't say the word apologize in what she said. She did say that it wasn't her intent to say what she said. She did say that. And I understand that she could have made a stronger apology. I would agree that reasonable minds could differ as to what words she could have used, but she used the words that she did. And Judge Hillman is one of those reasonable minds who found that whatever she said was appropriate. He reinforced the impropriety that came from those remarks and essentially put his stamp of approvals. And that's a matter of his discretion. So let me just tease out, and I'm going to try to weave in a little bit of your opposing counsel led with cumulative error principles, right? Putting cumulative error together is a little tricky. I think it's trickier than sometimes courts have given it credit for, because sometimes we just say there isn't cumulative error. But on the limiting instruction, we've got to really point a lot. We presume that jurors follow a limiting instruction, okay? But when you get something like saying that there's lies, lies, lies later, does that undermine? Does that undercut that presumption at all when you just sit there and say there's only so much that a jurors can be presumed to put out of their mind? And so we might be able to put out of their mind that we can't use that for guilt, but now we have kind of attacks on credibility that are very, very, very, I'm leaving nothing to imagination. And so does that combine in some way to undermine the presumption that the jury will follow the limiting instruction? I don't think so, not here, because the lies refers to Brisbane's testimony. It wasn't referring to the troubling remarks. It's referring to Brisbane's testimony. Now, the court would have to disregard the cross-examination of Mr. Brisbane in order to reach the conclusion that he wasn't lying. I mean, we're allowed to, I mean, and I think Judge McKee mentioned this before, there is case law saying that we can characterize a witness as lying. And whether we say he was lying or he's a liar, I'm not sure there's a difference. So if I hear your response, in one sense, what you're saying is, look, to the extent that what happened there was an error, it doesn't naturally combine with any of what would happen in the 404B space. They just, they can't be, they don't aggregate well. Yes, that's my argument. Okay, any questions from the panel? Judge Rendell, do you have anything further? Nothing further, thank you. All right, thank you very much. Thank you. All right, Mr. Suffron, we'll hear from you on rebuttal. Thank you, Your Honors. Just, I'll be very brief. The 403, the Caldwell analysis and the Huddleston analysis with respect to that four-part test, the 403 part that Judge Rendell hit on, that was only done with respect to the cash. That was the only balancing that was done. At least my review of the record indicated it was not with respect to the prior drug dealing conduct. It was just with respect to the evidence, I think related to the cash, maybe the two cell phones that were found in the glove box, but not the underlying pinpoint argument we're making with respect to the four-step process with respect to whether or not he was a drug dealer. And then with respect to, I mean, Judge Hillman said he was taken aback after the prosecutor's summation. I think those were his words. He said he was taken aback. I just, I don't know of any measure of curative instruction once that was done based on, and again, I know it's hard to aggregate error, and I have trouble explaining that except to note that, and I characterize it as sort of a triple witching hour, that the characterization of Mr. Griswold as a liar wasn't the only characterization made by the prosecutor. She characterized both Mr. Brisbon and this Mr. Waheed fellow who was in the car with Mr. Brisbane. Apparently the two of them were soliciting prosecutor, prosecutors, good God. Prosecutor, sorry. Was that a Freudian slip of the tongue? I'm going to ask that that be stricken from the record. Absolutely. Absolutely. So at one level, like this, aggregating error is hard, at least for me. But I guess my thought is if you're going to look for a common theme on which to aggregate error, wouldn't you say that the error aggregates in terms of overall credibility? Is this even permissible to say, hey, we think our guy's great. We're going to put in every reason we possibly can for a 90-minute delay, but we want to put in every reason we possibly can to call the other witnesses liars. I don't know that that works. But in terms of common theme, if you ask me, pick something in common here. The best I can do, and maybe you can outdo me, is credibility. And that doesn't feel like a particularly natural building blocks. But what do you think? I mean, I think you have it. I think that's probably right. It's not just credibility. It's the commentary on a defendant, witness, and another witness's ability to conspire, to co-conspire with each other and cook up a fictail to basically, as Judge McKee noted, suborn perjury. And she didn't just say the word lie once. She said it one, two, three, four, five, six, seven, eight. I mean, just in the first sentence on page 13 of our brief, she said it looks like 10 times. I took a direct quote directly from the transcript. And then she talks about the fact that the defense lawyer is just, oh, you don't care about that. Defense lawyers don't care about the truth. You know, in some cases, that's true. But a jury doesn't need to hear that. It's the job of the prosecutor to prove a defendant guilty beyond a reasonable doubt, not a job of a defense lawyer to exonerate their client. This almost breaches the level of commenting on someone's Fifth Amendment right to remain silent during the course of arguments. And so I equated to that, at least with respect to, again, I read that transcript. My mouth dropped open. It was astonishing to me. It was. I think you can infer from my comments. Mine dropped, I think, several times, and I was equally or maybe more astonished. Yeah. And so I think you all have it fairly correctly and understand the issues. And I thank your honors for your question. All right. Is there anything further? Judge Rendell, do you have anything further? Judge McKee? No, thank you. Thank you very much for counsel for your arguments today. We appreciate it. We appreciate the flexibility up here remotely that made this case that was a little bit delayed, less delayed.